UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LUCILLE TAGLIERE,          )
                           )
          Plaintiff,       )     No. 04 C 5258
                           )
vs.                        )
                           )     Judge Arlander Keys
HARRAH'S ILLINOIS CORPORATION )
d/b/a HARRAH'S CASINO JOLIET, )
                           )
          Defendant.       )

## MEMORANDUM OPINION AND ORDER

On August 19, 2001, Plaintiff Lucille Tagliere visited the
premises of Defendant Harrah's Illinois Corporation, d/b/a
Harrah's Casino Joliet (Harrah's), to engage in gambling
activities. Unfortunately, while aboard the river boat, she
fell. Plaintiff claims that, as a result of this fall, she
sustained multiple injuries which required her to take copious
amounts of medication and undergo numerous, painful treatments
and an invasive surgery. Believing Defendant to be liable, she
filed suit alleging that her fall resulted from its negligence in
failing to adequately inspect and maintain the chairs on its
vessels. The Court presided over a bench trial on October 20,
21, and 22, 2008. The following Opinion represents the Court's
findings of fact and conclusions of law pursuant to Rule 52(a) of
the Federal Rules of Civil Procedure.[1]

---

[1] To the extent that certain findings of fact may be deemed
conclusions of law, they shall also be considered conclusions.
Similarly, to the extent that matters contained in the

## FINDINGS OF FACT

### A. *Background Facts*

Plaintiff enjoyed gambling and did so solely at Defendant Harrah's river boat casino located in Joliet, Illinois. (T. Tr. at 54.) Because she frequented Harrah's – between one and eight times per month – she was elevated to the Diamond tier of Defendant's Total Rewards players' club; an association that conferred upon her, many benefits and privileges. (*Id.* at 53-5, 89.) Having received (from Harrah's) gratuitous tickets to a David Cassidy performance, she, along with her sister Theresa Bills and Theresa's friend Sarah Gross, traveled to Joliet to the Rialto Square Theater, on August 18, 2001, to attend the event. (*Id.* at 55-6.) Following the concert, the ladies dined at a steakhouse located at Harrah's and subsequently visited the VIP room, where they indulged in cream puffs and coffee – all of which was provided gratis by Defendant. (*Id.* at 57-8, 249.)

The women left Harrah's shortly after dining, as Ms. Gross does not gamble. (*Id.* at 58.) After returning Ms. Gross to her home, Plaintiff and Theresa drove to Theresa's house in Stickney, Illinois, where they, along with Theresa's husband Robert Bills and family friend Bill Castelli, decided to return to Harrah's. (*Id.* at 58-9.) They later arrived at Defendant's Southern Star

---

conclusions of law may be deemed findings of fact, they shall also be considered findings.

gaming vessel during the early hours[2] of August 19, 2001, at
which time they split - Mr. Castelli went in one direction and
the remaining group members went in another. (*Id.* at 59-60.)

Plaintiff, Theresa, and Robert went to the second floor of
the Southern Star. (*Id.* at 60-1.) After Theresa and Robert
chose a poker machine and began playing, Plaintiff walked to the
bar and ordered her first and only alcoholic beverage at any time
relevant to this litigation; she decided against drinking
anything intoxicating at the David Cassidy concert and opted
instead for Diet Coke at dinner. (*Id.* at 57, 61.) With drink in
hand, she began looking for a poker machine upon which to play
and ultimately decided upon a Triple Play machine that faced
Theresa and Bill, located across the aisle and to their left.
(*Id.* at 61-4.) Plaintiff stood and began to play and continued
playing until she won four-of-a-kind, which yielded 250 quarters.
(*Id.* at 62, 65.) By this time, the patron formerly occupying the

---

[2] The Court notes that the testimony regarding the time at
which the group arrived at Harrah's varies significantly. To be
sure, Plaintiff testified that they departed Stickney, en route
to Joliet, at approximately 1:30 a.m. on August 19, 2001. (T.
Tr. at 59.) She further indicated that the trip to Joliet is one
which takes fifty minutes. (*Id.* at 59.) Consequently, this
would indicate that the arrival time at Harrah's was
approximately 2:20 a.m. Theresa, however, testified that they
arrived at Harrah's between 1:00 and 1:30 a.m. on August 19th.
(*Id.* at 251.) Further, it was Robert's testimony that the women
arrived back in Stickney from the David Cassidy concert at either
midnight, 1:00 a.m., or 2:00 a.m. (*Id.* at 216.) Because of the
considerable discrepancy, the Court declines to adopt a specific
time. In any event, this detail is of no consequence to the
Court's ruling.

chair to her right had left and Plaintiff, dressed in jeans and gym shoes, decided to get "comfortable." (*Id.* at 65, 81.) Plaintiff, for unknown reasons, then "flew straight back" and landed on her outstretched hands. (*Id.* at 66-7.) Robert, having rushed to the area upon hearing her scream and being no longer able to see her, pulled Plaintiff from the casino floor, to her feet. (*Id.* at 219-22, 253.)

With "sore" hands, an embarrassed Plaintiff, "want[ing] to get away from where [she] was," walked to a machine located in a different part of the casino and began playing. (*Id.* at 73-4.) After subsequently speaking with a member of Defendant's security team, she decided to document the fall by making an accident report. (*Id.* at 81.) Shortly thereafter, she was approached by Franklin J. Tyse, a Guest Safety Casino Supervisor, who took a statement from her regarding the events that had transpired. (*Id.* at 80, 83-4, 287.) Following the interview, Mr. Tyse physically inspected the chair on which Plaintiff indicated that she was attempting to sit, as well as other chairs in the area, and found none to be defective. (Def.'s Ex. 1.) He then returned to the supervisor's office where, using the notes transcribed on his personal writing pad, he prepared a typewritten incident report. (T. Tr. at 295.)

Plaintiff and the other members of her party subsequently departed the casino. (*Id.* at 88.) And as she expected, when she

4

awoke later on August 19th, the pain in her hands had worsened. (*Id.* at 98.) Therefore, on Monday, August 20, 2001, she telephoned Dr. Edward Tong, her physician of at least eight years, and attempted to schedule an appointment. (*Id.* at 98-9.) At that time, he recommended that she see one of his associates, however, she declined and instead chose to wait until she could see him; her appointment was scheduled for August 23, 2001. (*Id.* at 98-9, J. Ex. 2 at 10.)

During her appointment, Plaintiff told Dr. Tong that four days earlier, she had fallen backwards and landed on her outstretched hands. (J. Ex. 4 at 11.) She was experiencing, *inter alia*, pain in her left arm and wrist; specifically, her left arm hurt from her shoulder to her wrist. (*Id.*) And while there was no numbness, there was tingling present and also weakness secondary to pain. (*Id.*) Both her left shoulder and left wrist were tender. (*Id.*) Dr. Tong diagnosed Plaintiff as having left shoulder strain and left wrist sprain. (*Id.*) He advised her to rest her arm and apply ice three to four times per day. (*Id.*) After prescribing Celebrex,[3] Dr. Tong instructed Plaintiff to call or return if not improved. (*Id.*)

On October 18, 2001, Plaintiff returned to Dr. Tong. (*Id.* at 10.) Though having completed four weeks of occupational

---

[3] Celebrex is "an antiinflammatory medication to bring down pain and any inflammation of joints, muscles." (J. Ex. 2 at 25.)

5

therapy, she continued to experience left wrist pain that occasionally radiated up her arm to her shoulder. (*Id.*) While the wrist pain had improved slightly, it tended to increase with wrist extension. (*Id.*) At the visit, Dr. Tong noted that Plaintiff was wearing a wrist splint and, though her wrist remained slightly tender, it had full range of motion and was not swollen; her strength was a five grade on a scale of five. (*Id.*) Dr. Tong diagnosed Plaintiff as having chronic left wrist status post fall at Harrah's. (*Id.*) He noted that the pain failed to improve with immobilization, Celebrex, or occupational therapy. (*Id.*) Plaintiff was advised to continue to rest, apply ice, and wear a splint. (*Id.*) Additionally, Dr. Tong referred her to Dr. Tariq Iftikhar. (*Id.*)

Dr. Iftikhar initially examined Plaintiff on November 19, 2001. (J. Ex. 6 at 1.) At that time, she informed him that she had fallen at Harrah's and landed on her outstretched left hand. (*Id.*) She complained of pain which began in the region of her cervical spine and was felt in her left upper extremity. (*Id.*) Though Dr. Iftikhar reported that these were the only complaints associated with the fall at Harrah's, he also noted that Plaintiff suffered from occasional numbness and paresthesias as well as numbness in the median nerve distribution of her left hand. (*Id.*) Dr. Iftikhar's report indicated that Plaintiff's physical therapy had been discontinued because she had improved

6

the range of motion of her wrist and digits; an increase in grip and pinch strength was also noted, though she continued to complain of pain in her wrist during extension activities. (*Id.*) Dr. Iftikhar opined that Plaintiff did not seem to be in "acute pain or obvious distress," though upon palpation, he noticed tenderness over the C5-C6 area on her left side. (*Id.*) After noting that Plaintiff smokes approximately one-and-a-half packs of cigarettes per day, Dr. Iftikhar recommended that she decrease that number or stop smoking completely "because of the potential hazard to the nerves and small vessels in the extremities." (*Id.* at 1-2.) His impression was that Plaintiff suffered from a cervical strain (rule out herniated disc of cervical spine with radiculopathy) and left carpal tunnel syndrome. (*Id.* at 2.) She was advised to have an electromyography (EMG) and a nerve conduction velocity (NCV) done, along with a magnetic resonance imaging (MRI) scan of her wrist and cervical spine. (*Id.*) The results of the MRI and EMG were to be used to guide Plaintiff's subsequent treatment. (*Id.*)

On November 26, 2001, Dr. Timothy K. McGonagle performed an EMG on Plaintiff at MacNeal Neurodiagnostic Laboratory. (J. Ex. 12 at 1.) He opined that there was no indication of either mononeuropathy or radiculopathy. (*Id.*) The results of the EMG, Dr. McGonagle wrote, "strongly suggest that [Plaintiff's] symptoms are on a musculoskeletal basis." (*Id.*) He further

noted that "[s]ome consideration may be given to a good portion of [Plaintiff's] symptoms being related to cervical periscapular spasm with referred pain and paresthesiasis." (*Id.*) On the same day, Plaintiff had an MRI scan of her left wrist done at Berwyn Magnetic Resonance Center (BMRC), which revealed a "[t]iny focus of edema within the proximal pole of the scaphoid which may be degenerative or post-traumatic." (J. Ex. 6 at 5.) An MRI of her cervical spine was also done at that time. (*Id.* at 3.) Though the results of this exam were never disclosed to Plaintiff, the scan revealed, *inter alia*, a "[m]ild left-sided disc protrusion of the C5-6 level" and a "[v]ery small disc bulge at the C6-7 level." (T. Tr. at 107, J. Ex. 6 at 4.) Additionally, there was a "compromise of the left neural foramen and lateral recess."[4] (J. Ex. 10 at 5.) Further, the signal intensity of the cervical cord was normal. (*Id.* at 4.)

Plaintiff again saw Dr. Iftikhar, this time on January 16, 2002. (J. Ex. 6 at 8.) In correspondence to Dr. Tong regarding the visit, Dr. Iftikhar indicated that the MRI showed that Plaintiff "probably has a very tiny localized bruise of the proximal pole of the scaphoid with a tiny focus of edema." (*Id.*) He also noted that Plaintiff indicated that she was "markedly improved and has no problem." (*Id.*) Because of the MRI findings

---

[4] Dr. Iftikhar testified that this meant that there was a disc herniation that caused "the canal for the spinal cord [to be] a little bit narrower." (J. Ex. 1 at 19.)

and the normal clinical examination (which included complete range of motion in the left wrist with excellent strength), Plaintiff was advised to return as needed. (*Id.*)

Plaintiff returned to Dr. Tong on July 9, 2002, for a physical examination. (J. Ex. 4 at 8.) During the visit, she also complained of off-and-on bilateral arm numbness from her elbows down. (*Id.*) Though there was no weakness, she did experience tingling. (*Id.*) And while Plaintiff continued to have left wrist pain since the fall at Harrah's, Dr. Tong noted that she was not experiencing neck pain; further, her neck exhibited full range of motion. (*Id.*) He opined that Plaintiff suffered from bilateral upper extremity paresthesia and recommended that she have both a bilateral upper extremity EMG study and NCV done. (*Id.*)

On July 18, 2002, Plaintiff had a repeat EMG study done at Neurologic Care Associates, P.C. (J. Ex. 12 at 3.) Dr. McGonagle, again the examining physician, noted that, though the pain had previously been more prominent on her left side, Plaintiff was then experiencing "pain in the posterior shoulder regions bilaterally and also intermittent tingling and numbness predominately in the forearm of both upper extremities." (*Id.*) He opined that the EMG showed no evidence of a previous or ongoing cervical radiculopathy, plexopathy, or radial mononeuropathy in either upper extremity. (*Id.*) Dr. McGonagle

again stated that the findings "suggest that [Plaintiff's] symptoms are on a musculoskeletal basis." (*Id.* at 4.) Further, he indicated that Plaintiff's symptoms "are predominately related to cervical and periscapular muscle spasm with referred pain and paresthesiasis." (*Id.*)

At Dr. Tong's request, another MRI scan of Plaintiff's cervical spine was performed at BMRC on July 30, 2002. (J. Ex. 10 at 10.) At C5-C6, there was redemonstrated, a "central/left paracentral disc herniation . . . which abuts and minimally indents the left anterior spinal cord." (*Id.*) There was no definite spinal cord edema present, and the report indicated that the appearance had not changed significantly when compared with her prior exam. (*Id.*)

On September 11, 2002, Dr. Tong noted that Plaintiff was not improving with physical therapy. (J. Ex. 4 at 7.) Consequently, he referred her to Dr. Andrew S. Zelby, a neurosurgeon. (*Id.*, J. Ex. 2 at 33.) However, prior to seeing Dr. Zelby, Plaintiff presented to Dr. Tong on September 25, 2002, and complained of two days of left lateral neck pain with swallowing. (J. Ex. 4 at 7.) Dr. Tong palpated her neck and noticed that the left anterolateral portion was tender. (*Id.*) He opined that she suffered from left neck pain of questionable etiology and opted to treat her conservatively with Celebrex, a heating pad applied to the neck, and rest. (*Id.*) Plaintiff was advised to call in

10

seven to ten days if she was not better. (*Id.*)

On October 7, 2002, Plaintiff visited Dr. Zelby. (*Id.* at 76.) She informed him that in August 2001, she had fallen backwards, onto her palms, and awoke the following day with pain in her wrists, arms, shoulders, and neck. (*Id.*) Her pain, she reported, had improved after three to four months; however, she still sometimes got tingling paresthesias and dysesthesias in both of her arms. (*Id.*) Plaintiff stated that her symptoms were aggravated when she "lean[ed] on her elbows or sl[ept]" and were relieved with a change in position. (*Id.*) At that time, her pain was a one grade on a scale of ten, with ten being the most severe. (*Id.*) After noting the results of Plaintiff's cervical spine MRI from July 30, 2002, Dr. Zelby opined that Plaintiff suffered from cervical spondylosis but noted that her symptoms were "more consistent with a musculoskeletal or myofascial syndrome." (*Id.* at 77.) He reported that Plaintiff would likely not find relief with surgical treatment and suggested that "she try to quit smoking as this does speed up degenerative process in the spine." (*Id.*) Dr. Zelby recommended that Plaintiff participate in a home exercise program and prescribed Flexeril.[5] (*Id.*)

Plaintiff, having experienced two days of right upper

---

[5] Flexeril is "a muscle relaxer" that "alleviates muscle pain and tension and spasms." (J. Ex. 2 at 25.)

11

extremity pain, returned to Dr. Tong on April 15, 2004. (*Id.* at 4.) Though the pain had lasted approximately one-and-a-half years, it had become more constant. (*Id.*) She also suffered from chronic right hand finger numbness with weakness and tingling. (*Id.*) Dr. Tong noted Plaintiff's history of cervical herniated nucleus propulsis (herniated disc) at C5-6. (*Id.* at 3-4, J. Ex. 2 at 38.) He palpated her right shoulder and discovered that it was nontender to palpation; there was tenderness at the right base of her neck. (J. Ex. 4 at 3, 4.) Dr. Tong opined that Plaintiff suffered from chronic (more than three to six months duration) neck and shoulder pain and recommended that she be reevaluated with a new MRI scan of her cervical spine, as well as undergo an EMG and NCV study. (*Id.* at 3.) He treated her with Celebrex and Flexeril. (*Id.*)

Plaintiff presented to MacNeal Hospital on April 17, 2004, complaining of two days of intractable upper back pain. (*Id.* at 57.) In addition to back pain, she reported experiencing paresthesias in the right upper extremity. (*Id.* at 60.) She was admitted for pain control and was started on Flexeril and Celebrex; she also began both physical and occupational therapy. (*Id.* at 57.) While in the hospital, Plaintiff had an MRI scan of her cervical spine done, which redemonstrated the left-sided disc protrusion at the C5-6 level seen in prior examinations; it was "essentially stable since the prior study." (*Id.* at 43.) The

12

hospital records indicate that she had a known cervical disc which causes right arm radiculopathy. (*Id.* at 63.) Her principal diagnosis at discharge was disc herniation without myelopathy; secondary diagnosis was, *inter alia*, cervical spondylosis. (*Id.* at 57.) Because the pain became slightly better, Plaintiff was released on April 21, 2004. (*Id.*) Plaintiff filed her lawsuit herein on August 10, 2004.

Having lost her insurance, Plaintiff began seeing Dr. Kelly, a neurologist at the pain clinic located at the John H. Stroger, Jr. Hospital of Cook County (Stroger Hospital). (T. Tr. at 117-18.) She saw the physicians at Cook County for over two years, during which time they never requested that she receive physical therapy. (*Id.* at 118-19.) Instead, having requested and evaluated the results of another MRI scan, they opted to treat Plaintiff with four different pain medications and four steroid injections, only one of which she took. (*Id.* at 118-19, 122.)

Plaintiff did not visit Dr. Tong again until August 4, 2006. (J. Ex. 4 at 3.) He noted that she had a cervical herniated disc on her left side with chronic pain from the left side of her neck, radiating down into her left hand. (*Id.*) Her left hand was numb and felt weak. (*Id.*) An examination of her neck revealed that, though she had full range of motion, it was slightly tender at the mid-cervical spine. (*Id.*) He opined that diagnoses of cervical herniated disc and left carpal tunnel

13

syndrome were questionable. (*Id.*) Dr. Tong made a notation that he planned to obtain the results of Plaintiff's last cervical spine MRI and left upper extremity EMG and NCV. (*Id.*) He referred her to a neurosurgeon. (*Id.*)

On August 14, 2006, Plaintiff again had an MRI scan of her cervical spine done at BMRC. (J. Ex. 10 at 17.) After comparing the results with those of April 9, 2004, the physician "[a]gain noted egenerative [sic] changes of the cervical spine at the level of C5-C6 and C6-C7, especially the left C5-C6 where there is left lateral recess stenosis." (*Id.* at 18.)

Plaintiff presented to Dr. Gregory Macaluso at Loyola University Medical Center General Medical Clinic (LUMC) on August 28, 2006, complaining of neck pain. (J. Ex. 23 at 136.) During that visit, she indicated that she had fallen at a casino five years prior and, as a result, suffered from a cervical disc herniation. (*Id.*) Around the time of the visit, Plaintiff was suffering from weakness of her left arm as well as numbness and tingling with activity. (*Id.*) She told Dr. Macaluso that she had stopped taking her pain medications because they made her sick and she had grown tired of taking them. (*Id.*) She expressed a desire to undergo surgery to alleviate the problem. (*Id.*)

On October 27, 2006, Plaintiff visited Dr. Tong following an emergency room visit. (J. Ex. 4 at 2.) She had experienced one

14

week of pain in her mid-sternum and mid-back. (*Id.*) The pain worsened with any movement and resolved when Plaintiff sat still. (*Id.*) Upon palpating Plaintiff's neck, Dr. Tong discovered that it was tender mid-cervical spine. (*Id.*) He opined that her upper back and neck pain was of muscular origin; she was experiencing muscular spasms in her neck. (*Id.*) Dr. Tong advised Plaintiff to take Celebrex instead of ibuprofen and also prescribed a muscle relaxer. (*Id.*, J. Ex. 2 at 49.) If not feeling better by the following week, Plaintiff was told to notify Dr. Tong; at that time she would again be referred for physical therapy evaluation and treatment. (J. Ex. 4 at 2.)

Plaintiff visited LUMC on November 22, 2006, and saw Dr. William J. Benedict, a resident. (J. Ex. 23 at 133-35, J. Ex. 3 at 12.) She informed him that she had fallen at a casino in August 2001 and began having neck and arm pain at that time. (J. Ex. 23 at 133.) Though the pain started in the C6 distribution on her right side, it subsequently moved to her left. (*Id.*) She was experiencing difficulty with her left upper extremity secondary to weakness, as well as numbness in the C6 distribution. (*Id.*) Dr. Benedict opined that Plaintiff's status was "post 3 different operations starting over 25 years ago as the result of what sounds like, by history, herniated disks." (*Id.*) He noted that, while Plaintiff did have a "disk herniation which is causing mild effacement of the exiting root at C5-C6,"

she was not likely to benefit from surgery. (*Id.* at 135.) He opted to follow her progress and if she failed to improve with nonsurgical treatment, he suggested that she consider a diskectomy at the C5-C6 level. (*Id.*)

Plaintiff began physical therapy on December 12, 2006.[6] (*Id.* at 103-04.) During her initial visit, she complained of bilateral arm pain, greater on the left than right. (*Id.* at 104.) This resulted, she said, from a "[f]all five years ago on buttocks with arms outstretched behind her." (*Id.*) On her best day, the pain was a five grade on a scale of ten, on her worst, an 8/10; on the day of her physical therapy visit, it was a 5/10. (*Id.*) Factors that tended to aggravate the condition included: washing hair, folding laundry, driving, and sleeping; resting relieved the symptoms. (*Id.*) She continued with physical therapy until February 26, 2007, at which time she was released, having made minimal improvement. (*Id.* at 77.) Plaintiff still suffered from paresthesias in her left arm, at the fourth and fifth digits. (*Id.*) She also indicated that she had begun experiencing paresthesias in her right arm. (*Id.*) On the day of the visit, her arm pain was 5/10. (*Id.*)

On March 20, 2007, Plaintiff visited the MacNeal Hospital

---

[6] The record is replete with documentation of Plaintiff having received physical therapy treatment and evaluation. Because these records generally offer nothing beyond that included in the records of the referring physicians, these visits will not be discussed in great detail.

16

emergency room. (J. Ex. 21 at 2.) She complained of left-sided neck and shoulder pain that radiated to her left arm. (*Id.*) She reported experiencing intermittent numbness in her arm and informed the emergency room personnel that she had experienced the same pain approximately three years prior. (*Id.*) The emergency room physician reviewed Plaintiff's hospital records from August 14, 2006, and noted that Plaintiff suffered from degenerative changes at C5-6, especially left C5-6. (*Id.*) A physical examination revealed that Plaintiff's shoulder and neck were tender. (*Id.*) She was given medication and a nicotine patch, advised to contact Dr. Tong, and discharged home. (*Id.* at 3, 8.)

Following her emergency room visit, Plaintiff presented to Dr. Nockells on March 22, 2007, and complained of a "significant exacerbation of her left arm pain and neck pain." (J. Ex. 23 at 71.) She was admitted for pain control and had another MRI scan of her cervical spine performed. (*Id.* at 71-2.) The scan, performed on March 23, 2007, revealed "a moderate spinal canal stenosis secondary to a mild broad-based posterior disc bulge with a superimposed left paracentral disc protrusion superimposed on the developmentally slender spinal canal." (*Id.* at 151.) Additionally, degenerative changes from C4-5 to C6-7 were noted. (*Id.*) The report noted "mild intervertebral disc dessication and narrowing" at C5-C6. (*Id.*) Sometime thereafter, Plaintiff was

17

offered the option of having surgery.  (J. Ex. 3 at 33.)

On April 20, 2007, Dr. Nockells performed a C5-6 corpectomy and fusion on Plaintiff.  (*Id.* at 34.)  Shortly after her surgery, Plaintiff's pain was a 1/10, but she experienced some residual left 1-3 digit numbness.  (J. Ex. 23 at 68.)  The numbness continued in the months following surgery, and she also began to complain of difficulty swallowing.  (*Id.* at 65.)  In addition, the surgery left a scar on her neck.  (T. Tr. at 132-33.)  While some of the symptoms resolved, others persisted throughout the time of trial.  (*Id.* at 133.)

Plaintiff's complaint herein, filed on August 10, 2004, seeks judgment against Defendant for "severe injuries of a personal and pecuniary nature," resulting from Defendant's alleged carelessness and negligence in inspecting and maintaining the chairs and stools on its gaming vessels.  The Court has jurisdiction under 28 U.S.C. § 1333(1).

B.  ***Testimony at Trial***

The Court presided over a bench trial in this matter between October 20, 2008 and October 22, 2008.  At the trial, Lucille Tagliere, Robert Bills, Theresa Bills, Franklin Tyse, and David McDade testified.  In addition, the parties entered into evidence, the deposition transcripts of Dr. Tariq Iftikhar, Dr. Russell Nockells, and Dr. Edward Tong.

1.  **Lucille Tagliere**

Plaintiff's pertinent testimony follows. After winning four-of-a-kind, she decided to remain at the machine and play the credits that had accrued. (T. Tr. at 65-6.) Initially, she stated that she "went down" as she held on to the machine to put her foot up – that at the time when "she flew straight back," she did not know what happened. (*Id.* at 66.) However, she later testified that, after glancing at the bottom ring of the chair situated to her right, and failing to see anything that would indicate that the ring was defective, she placed her right foot on it. (*Id.* at 65-6, 70-1.) The ring was indeed broken and caused her to fall, hit her head on the knees of two patrons, and land on her outstretched hands. (*Id.* at 67-9.)

After being assisted to her feet by Robert and other casino patrons, Plaintiff told Robert that she did not know what had happened. (*Id.* at 72-3, 150.) At that time, she noticed that her hands were sore. (*Id.* at 72-3.) She was embarrassed and wanted to leave the area in which she had been playing, so she went and began playing on a machine in a different area of the casino. (*Id.* at 73-4.) However, prior to leaving the area, Robert looked at the bottom ring of the chair to her right and said, "That's where – what you fell on is the [left ring] was broke. It's broke." (*Id.* at 74.) For the first time, she looked and noticed that the left front ring was hanging; however, she did not see

19

any debris, including, broken metal or screws, laying on the carpet. (*Id.* at 75-6, 157.)

Though Plaintiff played at the new machine until she had no credits remaining, her hands continued to hurt. (*Id.* at 79.) At that time, she was approached by Val Aiken, a member of Defendant's security department, who urged her to make a report, as she had fallen hard. (*Id.* at 80.) Though she did not want or feel it necessary to report the incident, she subsequently agreed to do so. (*Id.* at 80-1.) A short time later, Mr. Tyse came and took her statement. (*Id.* at 83.) She told him, "My hands hurt. I'm more worried about my lower back than anything, because I had surgery. I'm just having - my hands are bothering me, you know." (*Id.* at 84.) She also told Mr. Tyse that she had fallen on her leg. (*Id.* at 151.) However, she never told him that she had injured her leg nor that her foot had slipped from the chair ring. (*Id.* at 86.) Instead, she testified that she told him that she was concerned about her leg as she had undergone three lower back surgeries. (*Id.* at 150.) However, she later testified that she did not say that she was concerned about her leg, rather, she stated that she told him that she was worried about her back. (*Id.* at 150-51.) When confronted with her deposition testimony, Plaintiff admitted that she had indeed told Mr. Tyse that, as a result of three lower back surgeries, she was worried about her leg. (*Id.* at 151-52.) She testified that at

20

the time of her fall, she was definitely worried about her leg and back and stated, "First thing I told [Mr. Tyse] is my lower back and my left leg, I'm worried about more than anything." (*Id.* at 153.) At that time, Mr. Tyse offered her medical attention that she declined because she was embarrassed and only her hands hurt. (*Id.* at 156.)

Plaintiff told Mr. Tyse that the ring of the chair was broken, and that Theresa and Robert had both seen it. (*Id.* at 154-55.) However, rather than speaking with Robert or Theresa or inspecting the slot machine or chair, Mr. Tyse, immediately after taking her report, walked through the door and down the stairs that allowed passengers to exit the river boat. (*Id.* at 86-8.) After providing her statement, she was "just trying to find everybody," and left the casino shortly thereafter. (*Id.* at 88.)

Plaintiff then testified about the casino chairs. At the outset, she noted that, though the casino had two types of chairs – slot chairs and bar stools – they were indeed the same chair, with the exception that the bar stools were taller. (*Id.* at 93.) These chairs had four metal legs with a metal ring around the bottom. (*Id.* at 97.) Prior to her accident, she noticed that the chairs on the Southern Star vessel were in "horrible" condition. (*Id.* at 90.) Indeed, she testified that she infrequently heard individuals – patrons and employees alike – complaining about the bar stools; though she later testified that

21

she heard complaints regarding all of the casino chairs. (*Id.* at 90-4, 149-50, 307.) Specifically, Defendant's employees complained that the bottoms of the bar chairs were broken. (*Id.* at 148-49.) However, "They didn't say ring or nothing. They just said the bottom of the chair. They're all broke, half of them." (*Id.*) But because of an accident that Plaintiff witnessed with a bar stool, she assumed that the complaints related to the bottom ring of the slot chair. (*Id.* at 149.) During said incident (the only incident that Plaintiff witnessed), she saw a guest at the bar "jam their hands on the bar to get up on the rung, and it was broke." (*Id.* at 90-4, 145-46.) The casino patron "pulled himself up, then stepped down on the ring on the stool to get himself – you know, he stepped on the ring and jammed the hands." (*Id.* at 93.) She was unaware of any prior incidents involving slot chairs. (*Id.* at 145-46.)

Plaintiff visited Harrah's during all times of the day, yet never witnessed anyone inspecting or maintaining the chairs. (*Id.* at 94.) Following her accident, she visited the casino, at which time there were no longer river boats; rather, the casino had been converted into a barge. (*Id.* at 95.) At that time, everything in the casino was new, including the chairs. (*Id.* at 192-93.)

When Plaintiff awoke on August 19, 2001, her hands were "killing" her. (*Id.* at 98.) She did not feel neck pain at that

22

time, nor did she experience any while on the boat following the incident. (*Id.*) Because of the pain, she attempted to make an appointment with Dr. Tong, her family physician, but he suggested that she see his associate. (*Id.* at 99.) Instead, she chose to wait until she could see him days later. (*Id.*) After complaining of pain in her arm and neck, Dr. Tong examined her and prescribed her medication. (*Id.* at 102, 161-62.) Plaintiff, however, later testified that she did not tell Dr. Tong at that time that she was experiencing pain in her neck.[7] (*Id.* at 161.) Instead, she testified that she "felt it from [her] neck."[8] (*Id.*) She began occupational therapy for her hand and wrist and was subsequently referred to Dr. Iftikhar for treatment of her wrist. (*Id.* at 103-04, 166.)

During Plaintiff's November 2001 visit to Dr. Iftikhar, "he was going up and down [her] arm; and then he went by [the left side of her] neck, and [she] just pulled back because it hurt." (*Id.* at 104-05.) Her neck pain occurred only "once in a great, great while" and this was the first time that Plaintiff experienced neck pain following her fall; she did not recall

---

[7] Plaintiff testified that because she believed that the doctor that she was seeing was "liable" for her care, she told him everything. (*Id.* at 200.) However, it was also Plaintiff's testimony that she never told Dr. Tong that she was experiencing neck pain. (*Id.*)

[8] The Court is strained to comprehend the distinction - how an individual can experience pain "from the neck," without experiencing neck pain.

23

telling Dr. Iftikhar that she began experiencing pain at Harrah's, after her fall. (*Id.* at 162.) At Dr. Iftikhar's recommendation, she had an MRI scan done of her hand and neck. (*Id.* at 104.) Also per Dr. Iftikhar's request, Dr. McConagle conducted an EMG study on her left arm and wrist. (*Id.* at 105-07.) Though Dr. Iftikhar subsequently informed her of the condition of her wrist and arm, he failed to tell her that she had a herniated cervical disc at C5-C6. (*Id.* at 107.) However, he told her that he was unable to provide her with further treatment. (*Id.*)

Plaintiff visited Dr. Tong again on January 9, 2002, and though she was experiencing throbbing pain in her hand that radiated up and down, she failed to inform him of this pain. (*Id.* at 169.) She did not do so because Dr. Iftikhar was her treating physician at the time, and she informed him of the pain. (*Id.*) Though she continued to have the pain when she visited Dr. Tong on February 24, 2003, and was no longer being treated by Dr. Iftikhar, she failed to report the pain to Dr. Tong. (*Id.* at 170.)

On July 9, 2002, she again visited Dr. Tong and indicated that she was well, with the exception that she was experiencing bilateral arm numbness from the elbows down, that occurred off-and-on. (*Id.* at 173.) She reported to him that she still experienced left wrist pain, but did not tell Dr. Tong that she

24

was not experiencing neck pain. (*Id.* at 174.)

Plaintiff subsequently made numerous visits to Dr. Tong for a myriad of health reasons. (*Id.* at 108.) Indeed, she visited Dr. Tong on January 9, 2002; October 21, 2002; February 18, 2003; March 10, 2003; July 9, 2003; July 16, 2003; July 31, 2003; and November 28, 2003, yet failed to make any complaints regarding pain. (*Id.* at 168-69, 178-81.) However, she later testified that Dr. Tong knew that she was always in pain and she always reported it to him. (*Id.* at 178-81.)

Though Plaintiff did not experience neck pain at the time unless a healthcare provider "pressed" on her neck, her arm pain worsened. (*Id.* at 108.) After informing Dr. Tong that she "couldn't take this pain anymore," he prescribed additional medication and recommended that she undergo another MRI scan of her neck and an EMG study. (*Id.* at 109-10.) Following this battery of tests, she was informed for the first time, that she still had a "disk out." (*Id.* at 111.)

In an effort to treat her neck, Plaintiff began physical therapy, but it failed to relieve the pain. (*Id.* at 112-13.) As a result, she began seeing Dr. Zelby, who urged her to stop smoking and informed her that he was unable to do anything about her neck pain, as she was not a candidate for surgery. (*Id.* at 112-13, 177.) He failed to inform her that she had a degenerative process in her spine. (*Id.* at 177.) She did not

remember telling Dr. Zelby that she experienced neck pain when she fell at Harrah's, though she later acknowledged that she could have. (*Id.* at 163, 177.)

On April 15, 2004, Plaintiff saw Dr. Tong and told him that she was experiencing bilateral upper extremity pain. (*Id.* at 182.) Because he knew that she always had left arm pain, she only reported new, severe pain to him; she had not been experiencing the right pain for a year-and-a-half – it was new and severe. (*Id.* at 183.) Indeed, she had not experienced right arm pain prior to that date; she did not recall complaining of right arm pain in 1996. (*Id.* at 183-84.) At the time of the visit, she told him that she was also suffering from right-hand finger numbness and tingling. (*Id.* at 182.)

On April 17, 2004, Plaintiff visited the emergency room at MacNeal Hospital because she was experiencing unbearable bilateral arm pain. (*Id.* at 115.) This pain, she felt, was exacerbated by her coughing. (*Id.* at 185.) During her hospital stay, she was given morphine and another MRI scan of her neck was performed. (*Id.* at 116-17.) She was informed that the scan revealed results similar to the prior scan. (*Id.* at 117.)

Plaintiff began receiving treatment for her neck, arms, and shoulders at the Stroger Hospital pain clinic in 2004 and continued for in excess of two years. (*Id.* at 117-18, 187.) Stroger Hospital physicians – specifically, Dr. Kelly – ordered

another MRI scan of her neck and prescribed several pain medications. (*Id.* at 118-19, 123.) Additionally, they attempted to perform four steroid injections on her, though she indicated that she was only able to tolerate a single injection that was given in her left shoulder. (*Id.* at 119.) However, she later admitted that if her medical records indicated that she had received it in her right, it was likely that she had indeed been given the injection in her right shoulder. (*Id.* at 186-87.)

Plaintiff saw Dr. Iftikhar again in November 2005 for problems relating to her foot. (*Id.* at 187.) She failed to mention her neck pain to him because "he wasn't [her] doctor anymore. [She] was very aggravated with him." (*Id.* at 187-88.)

Plaintiff returned to Dr. Tong in August 2006 and complained of left arm pain. (*Id.* at 124.) At that time, he recommended that she see Dr. Nockells, a neurosurgeon at LUMC. (*Id.* at 125.) During the time that she was seeing Dr. Nockells, Dr. Tong requested another MRI scan of her neck. (*Id.* at 126.) Though Dr. Nockells did not want to initially perform surgery on her, he later recommended surgery for her neck, as her pain subsequently increased to a ten grade on a scale of ten. (*Id.* at 127-28, 191-92.)

Plaintiff underwent surgery for her neck in April 2007. (*Id.* at 129.) She felt better following the surgery, though she initially testified that she began to experience pain in her neck

27

and the digits of her left hand; she also suffered from numbness
in her left hand. (*Id*. at 130.) She later stated that the only
pain that she experienced following the surgery was pain in her
hand; she testified that she was unable to turn her neck to the
right. (*Id*. at 131.) Additionally, she began to choke and her
neck began to "click." (*Id*. at 131-33.) While these symptoms
improved, they had not completely resolved and, as a result, they
interfered with her daily activities. (*Id*. at 131-39.) She
also has a scar on her neck from the surgery. (*Id*. at 132.)

Plaintiff had no independent recollection of instances where
she would turn her neck, prior to the incident, and experience
pain.[9] (*Id*. at 158-59.) She did not remember visiting Dr. Tong

---

[9] On direct examination, Plaintiff and her counsel engaged
in, to say the very least, a rather . . . confusing exchange.

> Q: Now, do you remember – did you ever at any time go in to
>    Dr. Tong and complain of any kind of neck pain or
>    anything of that nature?
> A: Well, I must – I might have. I've heard it, so I must
>    have, but I –
> Q: Before August of 2001, I'm talking about.
> A: No. I had no neck pain. I just had the –
> Q: Did you ever go in and complain to him? Do you recall?
>    I mean –
> A: No, no neck pain, no.
> Q: I mean before August of 2001, I'm talking about.
> A: Oh, yeah, what I saw on the thing, the deposition, yeah,
>    twice, I did.
> Q: But do you remember that, though?
> A: No. I didn't know that.

(T. Tr. at 101.)

The Court believes that it was Plaintiff's ultimate
testimony that she twice visited Dr. Tong complaining of neck

in August 1996 and reporting that she had turned her head in the car, strained her neck, and suffered pain radiating down her right arm as a result. (*Id.* at 159.) Nor did she recall telling Dr. Tong at that visit that she had been treated in the emergency room three days prior, during which time they took x-rays and prescribed pain medication. (*Id.*) Additionally, she did not recall visiting Dr. Tong during that same month and reporting pressure in her right upper back (which radiated down her arm) or occasionally experiencing tingling and numbness in her right hand. (*Id.*) Plaintiff did not remember Dr. Tong palpating her at any time prior to the incident at Harrah's and it producing pain. (*Id.* at 160.) Additionally, she did not remember visiting Dr. Tong in October 1999 and complaining of one week of numbness and tingling in her entire left arm and hand, nor did she recall experiencing any pain in her left shoulder and left neck prior to the incident. (*Id.*)

## 2. **Robert Bills**

The testimony of Plaintiff's brother-in-law, Robert Bills, was as follows. Having visited Harrah's once or twice a year, he noticed that the chairs and other equipment was in "pretty poor" condition. (*Id.* at 214.) The casino chairs had four legs with rings going around the bottom; he did not know the manner in

---

pain prior to August 2001, though she remembered these occasions only after reading a deposition. (*Id.*)

which the ring was attached to the chair. (*Id.* at 224, 237, 243.) He initially testified that both the rings and legs were made of wood; he subsequently changed his testimony to indicate that the ring could possibly have been made of metal, but he was not sure, as he had only looked at it for approximately ten to fifteen seconds. (*Id.* at 225.)

On the day in question, Robert rushed to the area, having heard Plaintiff scream, and found her laying on the floor of the casino. (*Id.* at 219.) He bent over, grabbed her arm, and picked her up. (*Id.* at 222.) At that time, she told him that she had fallen after stepping on the broken chair. (*Id.* at 223.) He then looked at the chair and noticed that the right rear portion of the ring was indeed broken. (*Id.* at 224, 233.) However, he did not see any screws or pieces of broken metal laying on the floor in the area. (*Id.* at 225.) Plaintiff also indicated that her wrist was hurting; she might also have mentioned her back, though he could not remember for certain. (*Id.* at 222, 226.)

Plaintiff, slightly embarrassed, went to another area of the casino to sit down because there was nowhere else to sit. (*Id.* at 226.) Though no employee from Harrah's approached Robert or Theresa, approximately fifteen to twenty minutes after the incident, he saw Plaintiff talking to a man that he assumed was a Harrah's employee. (*Id.* at 227-28.) As Robert did not think that the accident was a "big deal," he did not notify anyone at

Harrah's that there was a defective chair on the casino floor.
(*Id.* at 233, 241.)   The group remained at the casino for another
hour, after which they departed for home.   (*Id.* at 228-29.)

## 3.   **Theresa Bills**

Theresa Bills, Plaintiff's sister, testified as follows.   On
the morning in question, she and her husband were playing at a
slot machine when they heard someone scream.   (*Id.* at 253.)   They
immediately rushed to the area from which they heard the scream,
at which time they saw Plaintiff laying on the floor.   (*Id.* at
253-54.)   As Robert pulled Plaintiff to her feet, she began
complaining of pain in her hands.   (*Id.* at 254.)   At that time,
Theresa and Robert asked Plaintiff what happened - she responded
by showing them that she had put her foot on the chair and the
ring of the chair was broken.   (*Id.* at 255.)   The chairs were
stools with four legs around them with a ring at the bottom.
(*Id.*)   On the chair in question, it appeared as though one side
of the ring was mounted while the right side was down, near the
carpet but not actually touching it.   (*Id.* at 256.)   Theresa did
not see any metal or screws on the floor.   (*Id.* at 257.)

Because Theresa still had monetary credits on her slot
machine, she returned to it following the accident; Plaintiff
left the area in which the incident had occurred.   (*Id.* at 257-
58.)   After approximately thirty minutes, she and her husband
began to look for the other members of their party so that they

could leave. (*Id.* at 259.) Her husband found Mr. Castelli (who had not witnessed the incident) and she located Plaintiff sitting in front of a machine. (*Id.* at 259-60.) No employee from Harrah's approached her for a statement regarding the accident nor did she witness Plaintiff speaking with a security guard. (*Id.* at 258-59.)

## 4. **Franklin J. Tyse**

Mr. Tyse, the former Harrah's Guest Safety Casino Supervisor who completed the incident report, testified as follows. He worked for thirty-four years as a police officer. (*Id.* at 284.) He began working for Harrah's (as a uniformed guest safety officer) in 2000 and retired five years later. (*Id.*) When he began, he was provided with both classroom and on-the-job training; however, he did not receive any specific training for discerning defects in chairs. (*Id.* at 284-87.) Additionally, he was later trained as to what details to include in an incident report, though he was "reamed" about his very first report because, at almost three pages, his manager felt that it was too verbose. (*Id.* at 296.)

After being "qualified" as a guest safety officer, Mr. Tyse was responsible for patrolling the floor, reporting issues to his supervisor, and providing general assistance to the casino guests. (*Id.* at 286.) He was subsequently promoted to supervisor and then became responsible for ensuring that the

32

guest safety officers were in their assigned locations, documenting incidents, and maintaining guest safety. (*Id.* at 287.) In this position, he worked from 6:00 p.m. to 7:00 a.m. (*Id.* at 309-10.) He testified that Plaintiff's Exhibit 1[10] – Harrah's Joliet Casino Key Control Log – did not reflect his work hours, as supervisors were not required to sign in; instead, the log was completed whenever he signed a key in or out. (*Id.* at 310.) He would sign a key in when he no longer needed it, but this did not indicate that he was leaving work for the day. (*Id.* at 311.)

Mr. Tyse was not required to touch and physically inspect each casino chair; he would touch the chair only if it was sitting in an aisle or tilted against a machine. (*Id.* at 315-16.) However, during his time at Harrah's, he, on two to three occasions, personally observed a ring hanging at the bottom of the seat pad of a slot chair; on those occasions, he contacted maintenance and had them remove the defective chair. (*Id.* at 288.) He may also have, on one or two occasions, witnessed "a rung that was loose with the fittings of the legs [of the chair]." (*Id.*) However, no complaints were made by guests and no injuries resulted on any of these occasions. (*Id.* at 289.) And while it was not unusual to see guests placing their feet on

---

[10] This exhibit was submitted to the Court as Plaintiff's Exhibit 2.

the bottom rings, he never witnessed nor was aware of an accident that occurred as a result, other than the accident in which Plaintiff was allegedly involved. (*Id.* at 308.)

Though Mr. Tyse was unaware of a procedure for any Harrah's employee to inspect every chair that was encountered, and though he never witnessed any employee physically inspect the chairs on a regular basis, several groups of casino employees had the opportunity to observe existing defects. (*Id.* at 316-17.) To be sure, slot workers, at the time that the machines were refilled with tokens or coins, could potentially have observed defects. (*Id.* at 289.) Similarly, environmental services workers had occasion to notice defects as they cleaned the casino and moved the chairs back and forth. (*Id.*) Further, waitresses and beverage servers may also have had occasion to observe flawed chairs. (*Id.*) However, though these various groups of employees had the opportunity to notice defects, no one ever reported a problem with the lower foot ring on a slot chair to Mr. Tyse. (*Id.* at 290.)

As a uniformed officer, Mr. Tyse was required to complete an incident report card if an incident occurred relating solely to defective casino equipment; these cards were discarded after one month. (*Id.* at 353.) If a chair was discovered to be defective while he was a supervisor, he would document the removal of the chair in the computer-generated shift report that was maintained

34

in the supervisor's office. (*Id.* at 292.) This monthly report was a "continual report running from day to day, one 24-hour period into another." (*Id.*) Though it was easy to retrieve a report that had been entered during that same month, he had not had occasion to recover a report entered outside of that time frame. (*Id.* at 292-93.)

Though Mr. Tyse did not know the age of the chairs, there were approximately 1,000 slot chairs on both the Southern Star and the Northern Star at the time of the accident. (*Id.* at 290-91.) These chairs had a metal ring and metal legs. (*Id.* at 290.) In 2001, they were in good physical condition. (*Id.* at 290-91.) He initially testified that the number of patrons that visited the casino (and thus utilized these chairs) on Monday through Thursday approximated between 800 and 1,000 people; he stated that the number of guests was higher on weekends. (*Id.* at 344.) However, when shown a Harrah's Casino - Joliet Guest Safety Department Daily Report (Pl.'s Ex. 3)[11], he acknowledged that, on August 18 to August 19, 2001, 9,866 people entered the turnstiles of both boats; he testified that this number would have been "somewhat less" on weekdays. (*Id.*) However, the casino was not likely crowded at the time of the actual incident. (*Id.* at 305.) Indeed, the crowd began to dwindle at

---

[11] This exhibit was submitted to the Court as Plaintiff's Exhibit 1.

approximately 4:00 a.m. and continued to dissipate, as the casino closed at 6:00 a.m. for maintenance; it reopened at 8:30 a.m. (*Id.* at 306.) And in addition to guests, on the night of the incident, there was likely one supervisor and three to four guest safety employees on each of the three levels of each of the casinos. (*Id.* at 354.)

Having no independent recollection of either the incident or Plaintiff, Mr. Tyse initially testified as to his standard procedures. Specifically, after receiving notice of the accident, he would acknowledge receipt, and if the guest was complaining of injury, he would have the reporting employee remain with the guest until he arrived. (*Id.* at 295.) As an initial matter, it was his practice not to "second-guess" or question the complaining patrons; in his incident reports, he reported what the guests told him. (*Id.* at 332-33.) If the patron alleged a defective condition in slot equipment, he would note it in his report and either take photographs or request video surveillance. (*Id.* at 296-97, 300-01.) Additionally, if the guest was alleging injury, he would request medical services, whether the guest's injuries were obvious or latent. (*Id.* at 296-97, 302.) If the injuries were indeed apparent, a photograph would be taken or video surveillance of the alleged defective condition obtained. (*Id.* at 307.) Information regarding the incident was recorded on his personal notepad and later taken

36

back to the supervisor's office (located approximately two to three blocks from the Southern Star) where it was inserted into a computer-generated form. (*Id.* at 295, 314-15.)

Mr. Tyse was notified of Plaintiff's incident at 5:35 a.m. (*Id.* at 299.) In response, he interviewed Plaintiff at a machine different than that at which the accident had occurred (5V10). (*Id.* at 303.) At that time, she told him that "she was attempting to sit in a chair at the slot machine 5W10 when her foot slipped off the ring at the bottom portion of the chair." (*Id.* at 299-300.) She also indicated that "'she stumbled backwards, bumping into two other guests that were playing at the slot machine directly behind her" and "when she made contact with the other guests, she hurt her left leg.'" (*Id.* at 301-02.) Additionally, she indicated that she wanted to file a report in case her leg continued to hurt; she declined to see a paramedic. (*Id.* at 302.) At the conclusion of the interview, Mr. Tyse presented Plaintiff with risk management materials and inquired as to the availability of any video coverage of the incident; he was told that there was no coverage available. (*Id.* at 304.) He then inspected the chair allegedly involved in the incident as well as either two additional chairs on either side of the machine or one chair on either side, as chairs were sometimes moved around by guests and employees. (*Id.* at 304-05.)

During the time that Mr. Tyse spoke with Plaintiff, she was

not shaking her hands; she made no complaints that her hands hurt. (*Id.* at 342.) Further, she was not limping or doing anything that would indicate that she was in pain. (*Id.*) Therefore, he had no reason to believe that she had sustained a serious injury, or any injury, for that matter. (*Id.* at 359.)

Despite being confronted with deposition testimony to the contrary, Mr. Tyse admitted that he did not take pictures of the chair; he stated that if he had, they would have been attached to his report and a notation would have been made in the report as to the existence of the pictures. (*Id.* at 335-36, 357.) He also acknowledged that there was information missing from the incident report. Specifically, the gold card number entry was blank because he either did not ask for the information or the casino guest failed to have the number readily available. (*Id.* at 297.) However, this information was easily obtainable by contacting "slots" and providing them with the guest's information (name, address, date of birth). (*Id.* at 326.) Additionally, there was no number entered into the driver's license/I.D. number field because he did not feel it necessary to include the number. (*Id.* at 298.) No witnesses were listed because there was no indication provided to him that there were witnesses to the incident; if a guest did not indicate that there was a witness, he did not ask. (*Id.* at 298-99.)

## 5. **David J. McDade**

At the time of the accident, Mr. McDade was Harrah's assistant director of slots. He testified, in relevant part, as follows. He began working at Harrah's in May 1994 as a slot technician. (*Id.* at 364.) From slot technician, he was promoted to slot performance supervisor, then slot performance manager, assistant director of slots, and later, to his current position – assistant director of food and beverage. (*Id.* at 364-65.)

When Mr. McDade began as a slot technician, he received several weeks of classroom and on-the-job training. (*Id.* at 365.) This training included maintenance of the slot machines and other slot equipment; the term slot equipment encompassed "[a]nything . . . on the slot floor that would have been associated with the slot machine, any part of the slot machine, the slot base, the slot chair, slot systems." (*Id.* at 366.) As a technician, he was "responsible for responding to floor calls, minor malfunction on the slot floor of the gaming equipment, and observing, patrolling the slot floor for potential safety issues." (*Id.* at 365.) Additionally, he and other slot technicians, were instructed to inspect the chair for loose rings every time that they touched the chair. (*Id.* at 377.)

Further, Mr. McDade testified that, during the hours that the casino was closed to the public, slot technicians would perform preventive maintenance on the slot machines, which

included, *inter alia*, moving the slot chair, taking it apart, and physically inspecting it for potential safety issues; in August 2001, the casino operated between the hours of 8:00 a.m. and 5:00 or 6:00 a.m. (*Id.* at 378.) He subsequently testified, however, that each machine was not checked every night at every shift, as part of the twice yearly preventive maintenance detail. (*Id.* at 379, 381.) Instead, he stated that the chairs were checked for potential safety issues as part of the slot technician's daily opening duties; he testified that, during these inspections, a slot technician did not necessarily touch each chair and would generally only do so if they needed to access the slot machine. (*Id.* at 379-80.) However, he stated that, even if the technicians did not physically touch the chairs, during the cleaning period they would provide a visual inspection for any defects in the slot chair. (*Id.* at 380-81.)

As a slot technician, Mr. McDade was made aware of the need for repair, either through communication from a coworker or as a result of his own personal observation. (*Id.* at 373.) During his time as a slot technician, he repaired the foot ring (which was of the screw-on variety during that time) of approximately one slot chair every couple of months.[12] (*Id.* at 371-73.) At the time of the trial, there were no records available of

_____

[12] The chairs currently in use have welded foot rings; Mr. McDade did not recall the manner of attachment for the chairs in use in 2001. (T. Tr. at 372.)

40

complaints made to slot technicians regarding possible problems with the bottom ring of the chair. (*Id.* at 384-85.)

Slot technicians, however, were not the only employees that would potentially detect and report loose foot rings – security personnel and environmental services employees could as well. (*Id.* at 377.) To be sure, while physically inspecting the slot chairs was not entailed in the job description of environmental services employees, those employees, in moving the chairs during the cleaning process, had previously noted and reported potential safety issues to the slot technicians. (*Id.* at 387.)

Further, in effect at the time of the accident was a program called the "safety chip program," whereby Harrah's employees were rewarded for bringing potential safety concerns to the attention of a supervisor or manager; specifically, employees were given a chip which could be saved and later redeemed for prizes and merchandise. (*Id.* at 403.) The program included the reporting of loose foot rings on slot chairs. (*Id.*) And employees were rewarded with a chip whether they saw an existing defect or physically inspected the equipment and discovered one. (*Id.* at 404.) The program applied when the discovery of defects fell outside of the employee's normal job responsibilities; however, the awarding of a chip was at the discretion of the employee's supervisor. (*Id.* at 404-05.)

Though it was the responsibility of all casino employees to

41

detect any safety issues, Mr. McDade – as assistant director of slot operations – was responsible for investigating any recurring issue, contacting the manufacturer, and working to resolve the problem. (*Id.* at 382.) Between 1998 and 2001, he was not made aware of any recurring safety issues involving loose or broken foot rings. (*Id.* at 382-83.) Indeed, the only incidents of which he was made aware involved patrons falling from the chairs as a result of not properly sitting on them. (*Id.*) In those instances, a guest safety officer inspected the chair for defects. (*Id.* at 380.) However, he was not the only individual to whom complaints regarding defective chairs were made. (*Id.* at 390.) Indeed, in 2001, there were fifteen to twenty slot technicians, approximately forty slot hosts, and four slot performance supervisors; he was the sole slot performance manager. (*Id.* at 390-91.)

In 2001, there were approximately 1,150 chairs combined on both vessels and of those, 150 chairs did not have foot rings. (*Id.* at 381.) The slot chairs on the Northern and Southern Star vessels were not the same, as they were provided by two different manufacturers. (*Id.* at 367.) As slot performance manager, Mr. McDade would have made the recommendation and the final purchase of the slot chairs; however, during the time period 1994 through 2001, he did not personally order any chairs. (*Id.* at 368.) The chairs on the Southern Star were purchased between 1995 and 1998

and, thus, between three and six years old at the time of the incident. (*Id.*)

When the casino vessels were converted into a barge, new slot equipment, including chairs, was purchased because the casino wanted new decor and because the existing vessels remained in operation up until the night prior to the opening of the new facility - safety and efficacy played no role in the decision to purchase new chairs. (*Id.* at 369-71.) Indeed, in August and September 2001, the chairs were in normal working condition. (*Id.* at 371.) Further, Mr. McDade opined that the chairs had a life expectancy of ten years. (*Id.* at 369-71.) He gave this opinion having purchased chairs for the permanently-moored barge facility (which came with a 10-year warranty) and finding the new chairs to be comparable to those found on the vessels prior to the conversion. (*Id.*)

Finally, Mr. McDade testified that in 2001, between the hours of 3:00 a.m. and 5:00 a.m., approximately two slot technicians were assigned to the Southern Star. (*Id.* at 374.) In addition to slot technicians, there were five to six slot hosts, one to two slot operations supervisors, and possibly a slot operations manager present. (*Id.*) With the exception of the slot operations manager, all were tasked with identifying and looking for potential safety issues. (*Id.* at 365, 375-76.)

43

C.  **_Evidence Deposition Testimony_**

In addition to live witnesses, the parties submitted evidence depositions of Dr. Tariq Dr. Iftikhar, Dr. Russell Nockells, and Dr. Edward Dr. Tong.[13]

## 1.  **Dr. Tariq Iftikhar**

Dr. Iftikhar, a neurosurgeon, testified, in pertinent part, as follows.  The results of Plaintiff's cervical spine MRI, performed on November 26, 2001, confirmed his clinical impression that Plaintiff suffered from a disc herniation.  (J. Ex. 1 at 18.)  Additionally, the test showed evidence of narrowing of the disc space, a degenerative condition.  (_Id._ at 42.)  Further, the results of the MRI revealed that the signal intensity of Plaintiff's cervical cord was normal; if it had not been, she would have possibly experienced more pronounced symptoms.  (_Id._ at 43.)  The MRI of Plaintiff's wrist showed bruising of her bone.  (_Id._ at 23.)  Though the EMG and NCV study showed no evidence of carpal tunnel syndrome, the EMG revealed that Plaintiff's pain was musculoskeletal in nature.  (_Id._ at 35.)  However, an EMG alone, cannot rule out nerve damage because "once the herniated disc irritates a nerve, the nerve supplies the muscles . . . and that causes the pain.  (_Id._ at 35-6.)

---

[13]   To the extent that medical records were presented in the Background Facts section of this Opinion, they will not be presented in detail again below.

Consequently, it was Dr. Iftikhar's opinion, based upon a reasonable degree of medical certainty, that in 2001, Plaintiff suffered from "a herniated disc on her left side, at C5 and C6 level" and a "bone bruise of the left wrist." (*Id.* at 28.) Further, based upon Plaintiff's history, clinical examination, and subsequent tests, "the fall was [the] probable cause for [her] problem[s]." (*Id.* at 30-1.)

A cervical spine injury generally manifests itself as pain in the neck area. (*Id.* at 42.) Indeed, Plaintiff's tenderness to palpation at the C5-C6 level was an indication that the disc herniation was pain-producing. (*Id.* at 49.) However, it can also present in the form of referred pain. (*Id.* at 42.) And not only could Plaintiff's injuries be pain-producing, it would also not be unusual for her condition to worsen over time. (*Id.* at 32-4.) If treated properly, Plaintiff may or may not have experienced recurring symptoms. (*Id.* at 34.)

In Dr. Iftikhar's January 16, 2002, correspondence to Dr. Tong, he reported that Plaintiff was markedly improved and had no problems at the time. (*Id.* at 44.) Though the letter only addressed Plaintiff's left wrist, the last sentence of the letter was "a little bit more general" which meant that "overall, she was doing well." (*Id.* at 45.) In other words, she was not experiencing problems with either her wrist or neck. (*Id.* at 44.)

45

Dr. Iftikhar admitted that he was not aware of any neck complaints made by Plaintiff prior to November 19, 2001. (*Id.* at 39.) When presented with documentation regarding prior symptoms of which Plaintiff had complained, he acknowledged that it was "difficult" for him to opine to a reasonable degree of medical certainty that Plaintiff's herniated disc was caused by her fall at Harrah's. (*Id.* at 39-40.) To be sure, Plaintiff's complaints from October 1999 of numbness in her left hand and arm, hand throbbing, and shoulder were possibly consistent with her November 2001 MRI findings. (*Id.* at 41.) However, he did not think that Plaintiff's August 1996 injury, in which she turned her head and experienced pain in the right side of her neck, was related to the injuries that she allegedly sustained from the fall at Harrah's. (*Id.* at 49.) Because it was possible that Plaintiff had the disc herniation prior to her fall at Harrah's, Dr. Iftikhar could not, to a reasonable degree of medical certainty, opine that the "findings on the MRI were caused by the fall or whether they . . . predated the fall." (*Id.* at 41.)

## 2. **Dr. Russell P. Nockells**

The testimony of Dr. Nockells, the neurosurgeon that performed Plaintiff's surgery, follows. It was his opinion, to a reasonable degree of medical certainty, that an individual can be asymptomatic yet have degenerative changes to her cervical spine at the C5-C6 level; similarly, a cervical spine disc herniation

46

can be present yet produce no symptoms. (J. Ex. 3 at 15, 17.)
Additionally, degenerative changes to the cervical spine at C5-6
can be present and the disc can later be herniated as a result of
a fall or other traumatic injury. (*Id.* at 16.) Further, a
patient can have an asymptomatic herniated disc and experience a
traumatic event that aggravates the herniation, which causes it
to become symptomatic. (*Id.* at 17.) Additionally, a patient can
have a disc herniation and subsequently have a new disc
herniation. (*Id.* at 18.) However, it is "beyond clear-cut
medical knowledge," whether a herniation to C5-6 can cause the
disc to degenerate further or at a more rapid rate. (*Id.* at 21.)
Absent any trauma, the first joint to demonstrate arthritic
degenerative changes is C5-6. (*Id.* at 50.) If the changes begin
at C5-6, changes are also initiated at the adjacent levels but
would be more pronounced at C5-6. (*Id.* at 51.) In instances
where there is both trauma and degenerative changes, there are no
objective studies to determine what can be attributed to each.
(*Id.* at 52.)

A cervical disc herniation can manifest itself solely as arm
pain (radiculopathy), without any neck pain. (*Id.* at 19-20.)
Whether the manifestation would appear in one arm or both depends
on the disc herniation; indeed, the radiculopathy for C5-6 can be
either left or right-sided. (*Id.* at 44.) As Plaintiff's C6
nerve root was primarily involved, the biceps and the

47

brachioradialis and the muscles involved in wrist extension would be affected. (*Id.* at 54.) A patient's symptoms from a cervical disc herniation can resolve spontaneously. (*Id.* at 17-8.)

Plaintiff's March 23, 2007, MRI scan was ordered as a result of an exacerbation of symptoms reported by Plaintiff on March 18, 2007. (*Id.* at 46.) The MRI results revealed degenerative changes in the cervical spine from C3 through C7. (*Id.*) Additionally, the scan showed a "mild left neural foraminal stenosis secondary to uncinate and facet degenerative changes"; the uncinate process is "the part of a degenerative change that can cause nerve root compression." (*Id.* at 47-8.) The MRI also revealed small anterior osteophytes from C4-5 to C6-7; osteophytes are "reflective of the loss of disc which occurs normally over time" and "as the disc degenerates, it becomes desiccated, which means that it . . . loses its water content." (*Id.* at 48-9.) There is, however, no clear-cut correlation between an acute herniation and dessication. (*Id.* at 53.) Indeed, intervertebral disc dessication and narrowing are anatomic changes associated with time. (*Id.* at 48-9.) Further, some people are born with "slightly smaller spinal canals," but may reach adulthood before displaying symptoms." (*Id.* at 49.)

The compression of Plaintiff's C6 nerve root necessitated surgery and caused her to experience left arm pain; Plaintiff's symptoms were also partly muscular in nature. (*Id.* at 34-5, 36.)

The compression resulted from a combination of problems; namely, "disc material and some spondylosis; and she had that somewhat slender canal, which made her more susceptible to radicular symptoms." (*Id.* at 35.)

Dr. Nockells was unaware of Plaintiff experiencing any complications following surgery. (*Id.* at 38.) However, Plaintiff did subsequently report difficulty swallowing, pain that was a one grade on a scale of ten, and left one-to-three digit numbness; the numbness, he testified is common. (*Id.* at 38-40.) As a result of the surgery, Plaintiff permanently lost some of the range of motion in her neck, though he was unsure as to how much she had prior to the surgery. (*Id.* at 40-1.) The surgery, however, would not have caused Plaintiff's neck to "click." (*Id.* at 42.) Further, she would not have recurring radiculopathy from the levels on which he operated; he performed a C6 verbrectomy and removed the discs at C5-6 and C6-7. (*Id.* at 43.)

## 3. **Dr. Edward Tong**

Dr. Tong, Plaintiff's family practice physician of eight years, testified, in relevant part, as follows. Plaintiff initially reported neck pain to him on August 15, 1996. (J. Ex. 2 at 69-70.) At that time, she reported that she had turned her head in her car two weeks prior and strained her neck. (*Id.* at 70.) She was seen in the emergency room three days prior to her

49

doctor's visit; X-rays were performed and she was prescribed pain medication. (*Id.*) Though Plaintiff's pain had improved at the time of the visit, she still felt pressure at her right upper back which radiated down her right arm; there was also tingling and numbness when she used her right hand. (*Id.*) These symptoms of radiating pain from the neck to the right arm, Dr. Tong opined, possibly suggested cervical disc impairment or herniation. (*Id.*)

Plaintiff again reported neck pain to Dr. Tong, this time on September 19, 1996.[14] (*Id.* at 71.) On May 10, 1999, she again reported neck pain. (*Id.* at 71-2.) On that date, Plaintiff complained of experiencing pain when she turned her head in either direction; she also experienced mid-thoracic back pain. (*Id.* at 72.) His examination revealed that her back was tender at the mid-thoracic spine and that her neck exhibited decreased range of motion that was secondary to pain. (*Id.*) He concluded at that time that Plaintiff suffered from musculoskeletal pains to her chest, neck, and back. (*Id.*)

Dr. Tong's next documented report of Plaintiff experiencing neck pain was on October 19, 1999. (*Id.* at 73.) At that time, she complained of one week of numbness and tingling in her entire left arm, hand. (*Id.*) She also suffered from throbbing pain in

---

[14] The medical records indicate that the date of this visit is actually September 10, 1996. (J. Ex. 4 at 30.)

her left shoulder that radiated up the left side of her neck.
(*Id.* at 73-4.) The symptoms increased if she leaned on her left
hand. (*Id.* at 74.) His assessment was that Plaintiff suffered
from paresthesia, possible left neck muscular strain, and carpal
tunnel syndrome. (*Id.* at 75.) Indeed, these symptoms were
similar to those reported by Plaintiff following her fall at
Harrah's; the main difference being that during Plaintiff's visit
following her fall, she failed to report neck pain as she did
during the October 1999 visit. (*Id.* at 74-5.) However, he had
no opinion as to whether Plaintiff's complaints of left arm pain
in October 1999 were related to her herniated cervical disc.
(*Id.* at 119.)

In both 1996 and 1999, Plaintiff exhibited symptoms
consistent with a herniated disc. (*Id.* at 75.) Consequently,
Dr. Tong was unable to say with any degree of medical certainty
that the disc herniation at C5-6 was not present during 1996 and
1999 when Plaintiff reported similar symptoms to those that she
reported following her fall. (*Id.* at 75-6.)

Dr. Tong's first record of Plaintiff complaining of neck
pain post fall was the November 19, 2001, letter from Dr.
Iftikhar. (*Id.* at 66.) Indeed, Plaintiff had provided a
different historical account of her symptoms; though she informed
Dr. Iftikhar that she was experiencing neck pain, she failed to
notify Dr. Tong of this during their August 23, 2001, visit.

(*Id.* at 66-7.) Additionally, she failed to mention neck pain during their visit on October 18, 2001. (*Id.* at 67.) And she made no complaints of neck pain to the occupational therapist – either on August 23 or October 18, 2001. (*Id.*)

On August 5, 2002, Dr. Tong noted in Plaintiff's chart that the "MRI of the cervical spine showed a small herniated disc at C5-C6." (*Id.* at 24.) At that time, he instructed her to undergo physical therapy and return to his office when the therapy was completed; if she was not better at that time, she would potentially require neurosurgical evaluation." (*Id.*) This was the first time that he was made aware that Plaintiff had a herniated disc in her cervical spine. (*Id.* at 26-7.) To be sure, he had never received copies of her 2001 MRI scan results. (*Id.* at 26.) Plaintiff began physical therapy on August 13, 2002; at that time, the physical therapist diagnosed her as having bilateral upper extremity paresthesia. (*Id.* at 28.) She continued to receive physical therapy until September 10, 2002; her diagnosis at that time was the same and therapy was discontinued as it was not benefitting her. (*Id.* at 29-30.) Dr. Tong opined that, if a patient with a herniated disc failed to respond to conservative physical therapy, the patient would have two options: surgery or a trial of epidural steroid injections. (*Id.* at 36.)

On September 25, 2002, Plaintiff complained of neck pain,

though Dr. Tong opined that it was of questionable etiology "because she ha[d] pain when she swallowed, but yet it wasn't a typical sore throat." (*Id.* at 33.) When confronted with his deposition testimony, Dr. Tong admitted that he could not say with a reasonable degree of medical certainty that the left neck pain that Plaintiff complained of during this visit resulted from her fall at Harrah's. (*Id.* at 79-81.)

Plaintiff failed to complain of neck pain or any injuries potentially related to the Harrah's fall during her January 9, 2002; February 20, 2002; and May 13, 2002 visits. (*Id.* at 81-3.) During her July 9, 2002 visit, she complained of wrist pain from the fall, but failed to complain of any neck pain. (*Id.* at 83.) Additionally, Plaintiff was seen in Dr. Tong's office on February 10, 2003; July 9, 2003; and November 20, 2003, yet failed to make any mention of neck pain or any injury potentially resulting from her fall at Harrah's. (*Id.* at 85.) When she did make another complaint of neck pain, it was on April 15, 2004; during that time, she experienced right-sided symptoms. (*Id.* at 86.) These symptoms differed from those reported following the Harrah's incident, as they occurred on her right side rather than her left. (*Id.*)

Plaintiff had not made complaints of right-sided symptoms since August 15, 1996; the symptoms reported on that date were virtually identical to those reported on April 15, 2004. (*Id.* at

53

86-7.) While it was possible that the symptoms Plaintiff
exhibited during her April 15, 2004 visit were related to the
fall at Harrah's, Dr. Tong could not say with any reasonable
degree of medical certainty that they were indeed related. (*Id.*
at 90.) Though he initially testified that he could not say to a
reasonable degree of medical certainty that the symptoms
Plaintiff reported on August 2001 were related to those that she
experienced in April 2004; he subsequently stated that the
symptoms were not related, as they were on Plaintiff's opposite
side. (*Id.* at 109.) Further, it could not be said to a
reasonable degree of medical certainty that Plaintiff's
increasing symptoms were not degenerative in nature. (*Id.* at 96-
7.)

There was a period of time in which Plaintiff did not visit
Dr. Tong, as she was being seen at another facility. (*Id.* at
98.) She did not return to him complaining of neck pain symptoms
until August 4, 2006. (*Id.*) The symptoms that she complained of
during that time were different from those that she reported in
April 2004, as the new symptoms were on her left side. (*Id.* at
98-9.) Dr. Tong, unaware of any treatment that Plaintiff
received at the other facility, was unable to say that
Plaintiff's August, 2006 symptoms were related to those
experienced in April, 2004. (*Id.* at 99.) Dr. Tong testified
that it was possible that Plaintiff's 2006 symptoms were related

to those from 2001. (*Id.* at 101.) However, he subsequently testified that, because Plaintiff complained of the same symptoms on August 4, 2006, as she did on August 19, 2001, that they were indeed related to the fall at Harrah's. (*Id.* at 107.)

Dr. Tong testified that it was his opinion, to a reasonable degree of medical certainty, that Plaintiff's herniated disc resulted from her fall at Harrah's. (*Id.* at 59.) He also stated, to a reasonable degree of medical certainty, that Plaintiff's musculoskeletal injuries to her wrist and shoulder were also due to the fall. (*Id.* at 60.) Plaintiff's injuries were pain-producing and would subject her to recurring symptoms. (*Id.* at 61.) Patients with a cervical spine herniated disc at C5-C6 would not necessarily have neck pain; they may only have left arm tingling arm and radiating pain up and down the left arm. (*Id.* at 115-16.)

Dr. Tong did not believe that Plaintiff's herniated disc resulted from her smoking. (*Id.* at 117.) Nor did he believe that the turning of her head in the car in August 1996 was related to her herniated disc. (*Id.* at 118.) He testified that, while the right-sided symptoms could be related to Plaintiff's fall, he could not relate them to her herniated disc. (*Id.* at 130.) He stated that, to a reasonable degree of medical certainty, Plaintiff's left-sided symptoms were related to her fall. (*Id.* at 130-31.)

## CONCLUSIONS OF LAW

It is well settled that a shipowner is not the insurer of the safety of its passengers. *Krus v. Harrah's Casino*, No. 99 C 2842, 2001 WL 1105071, at *5 (N.D. Ill. Sept. 19, 2001)(citations omitted). In order that liability be imposed, maritime law requires that there be some failure to exercise due care. (*Id.*) A "shipowner is liable for defective conditions aboard ship only when it has actual or constructive notice of them." (*Id.*) In order to meet her burden, Plaintiff must show, by a preponderance of the evidence, that Defendant had notice of the broken chair ring. The Court finds that Plaintiff failed to meet her burden in this regard.

Plaintiff attempted to prove that Defendant possessed the requisite notice by showing that the inspection procedures in effect at Harrah's at the time of the incident were non-existent, or, at the very least, insufficient. The Court is not convinced. While Harrah's assigned the responsibility of physically inspecting the slot chairs to only one group of employees, namely, the slot technicians, and only twice per year, this method, based upon Plaintiff's own testimony regarding the number of accidents that she witnessed, seems to have been efficacious. Plaintiff was a frequent patron of the casino and visited during all times of the day. Yet, she testified that she only witnessed one incident. Mr. Tyse, whom the Court found to be credible,

similarly testified that, in his five year tenure at Harrah's, he personally witnessed approximately five defective chair rings and as part of his job duties, had the chairs removed; he testified that none of the defects resulted in complaints by or injuries to casino patrons.

Further, it is entirely reasonable that an environmental services employee, though not specifically tasked with the responsibility of physically inspecting the slot chair, would notice defects with the lower rings when placing his foot on the lower ring and pushing the chair towards the machine. Indeed, Plaintiff herself indicted that the casino was kept clean, and considering the number of patrons that visited the vessels on a daily basis, it follows that the environmental services employees had lots of contact with the slot chairs and opportunities to detect any defects. The Court was also persuaded by Harrah's safety chip program, in which employees were encouraged to seek out potential safety issues and rewarded for reporting them.

However, it was not Plaintiff's burden to prove the efficacy of Defendant's inspection procedures. Instead, she was required to prove that Harrah's actually had notice of the defective foot rings. Plaintiff spent little time focusing on the issue of notice regarding the individual chair alleged to have injured her. Indeed, Plaintiff testified only that, prior to placing her foot on the ring, it appeared to be in normal working condition.

There was no testimony presented at trial that there was reason that Defendant should have been put on notice as to the defect existing in this chair, nor any testimony had as to an approximate time that the chair had been in its alleged defective condition. Consequently, the Court finds that Plaintiff failed to show that Harrah's had the requisite notice that Plaintiff's chair was defective.

Rather than focusing on the individual chair, Plaintiff focused on notice regarding recurring issues with chairs in the casino. Plaintiff testified that she heard patrons and employees alike complain of broken chair rings. Without more, Plaintiff's testimony is not persuasive. As an initial matter, Plaintiff testified that these complaints were infrequent. Further, testimony was presented that indicated that Harrah's casino chairs possessed both a ring at the bottom of the seat cushion and a foot ring, though Plaintiff admitted that she was not sure which ring the individuals complained of. She testified that she assumed, having seen an incident at the bar, that the lower foot rings were the subject of the complainants' ire.

This accident, Plaintiff stated, occurred when a casino patron attempted to access the bar by stepping on the bottom chair ring. The ring was broken, Plaintiff testified, and the guest "jammed" his fingers. However, this, without more, fails to aid Plaintiff in making her case. Indeed, as the guest

58

stepped on the ring to access the bar, it is entirely possible
that the ring, prior to his stepping on it was not broken, but
rather broke as a result of the patron placing his weight on it.
Consequently, this does not prove that the accident was
necessarily caused by a defective chair ring and that Defendant,
as a result, should have been put on notice.

Nor was it established that the bar chair on which the
accident occurred was the same type of chair on which Plaintiff
alleged that she was injured. To be sure, both Plaintiff and Mr.
Tyse testified that the bar chairs and slot chairs were one in
the same. Conversely, Mr. McDade, who was responsible for
researching and purchasing the chairs, testified that they were
not. Based upon the Court's finding regarding the weight of the
patron, however, the Court need not reach this issue.

The Court is similarly not convinced by Plaintiff's
testimony that the chairs on the casino were in "horrible"
condition. Because Plaintiff believed this to be true, it stands
to reason that she would have exercised greater care in placing
her foot on the ring, perhaps even inspecting it herself for
defects prior to placing her foot on it, especially having
witnessed an accident that occurred on the "same" type of chair.
However, it was her testimony that she looked at the ring only to
discern its location, not to ascertain whether the ring was
indeed safe.

The Court notes that Plaintiff's case seems to rest largely on her own accusations. Were courts to hold defendants liable based solely on assertions without more, courthouses around the country would be flooded with litigants (some deserving, others not) hoping to reap a windfall. Accordingly, courts do not operate in this manner. However, in the case at bar, the Court was presented with only Plaintiff's (sometimes inconsistent) allegations. For the reasons discussed above, the Court finds that Plaintiff failed to show that Defendant possessed the requisite notice of a defective chair ring.

Assuming *arguendo* that Plaintiff made her case, she still failed to prove that her accident resulted from a broken chair ring. Indeed, based upon Plaintiff's testimony, the Court is not convinced that Plaintiff is aware of the true cause of her fall. Noticeably absent from Plaintiff's response as to what she did to get "comfortable," is any reference to her placing her foot on a broken ring and falling as a result. Rather, her answer that she fell "just as [she] held on to put [her] foot down" ostensibly indicates that she fell without ever having placed her foot on the ring. The Court finds to be even more persuasive, Plaintiff's response to subsequent questioning regarding what happened when she attempted to place her foot on the ring. She testified that, "At that time, I didn't know what happened." This response is consistent with what Plaintiff told Robert

directly following the fall. To be sure, though Robert testified that immediately after the fall Plaintiff said, "'I started to step on the chair, and it broke, and I fell,'" Plaintiff acknowledged that she told Robert not that she had fallen as a result of placing her foot on a broken ring, but instead indicated to him that she did not know what had happened. It was only after several leading questions by her attorney that Plaintiff finally testified that she placed her foot on the broken chair ring and fell as a result. If indeed Plaintiff had fallen as a result of the ring, the Court would expect that she would have willingly volunteered this information, rather than having required her attorney to coax it out of her. Consequently, the Court cannot ignore Plaintiff's own words – neither those spoken at trial, nor those articulated to multiple individuals directly after the incident – that she did not know why she fell. And though Plaintiff may believe that she later understood the cause of her fall – a defective chair ring – the Court is not entirely convinced that her recollection is accurate. Therefore, the Court finds that Plaintiff has failed to show that a broken ring was the cause of her fall.

Further supporting the belief that Plaintiff was unsure of the cause of the accident is the incident report, in which she recounted a completely different set of events; namely, it states that she fell when her foot *slipped* from the foot ring of the

casino stool. Plaintiff, however, maintains that Mr. Tyse's report is replete with inaccuracies. And to prove it, she launched an attack on the statements contained in it. The Court is not convinced. She asserts that she told Mr. Tyse, "'My hands hurt. I'm more worried about my lower back than anything, because I had surgery. I'm just having – my hands are bothering me, you know.'" She testified that she never indicated, as contained in the incident report, that she hurt her leg. During cross examination, Plaintiff testified that she told Mr. Tyse that she was worried about her leg because she had undergone three lower back surgeries. After recanting, she testified that she told Mr. Tyse that she was worried about her lower back, not her leg. However she subsequently admitted that she told Mr. Tyse, "'I'm worried about my leg because I had three lower back surgeries. My hands are bothering me. It's no big deal.'" She further admitted that, at the time of the accident, she was indeed worried about both her back and her leg. And though she initially denied having told Mr. Tyse that she was worried about her leg, she subsequently testified that, "First thing I told him is my lower back and my left leg, I'm worried about more than anything." Further, when attempting to clarify what she had communicated to Mr. Tyse, Plaintiff testified that, "I told him I fell on my leg." However, when originally asked on direct examination what she told Mr. Tyse regarding any pain that she

was experiencing at the time, noticeably absent from her response is any reference to her leg. These were clearly attempts by Plaintiff to bolster her claim that Mr. Tyse's incident report was totally contrived - that he had gathered any references to her leg from the smoke-filled casino air.

Plaintiff's implication that she made no mention of her leg to Mr. Tyse was designed to have the Court believe that Mr. Tyse's report had to be inaccurate. However, though Plaintiff continued to maintain that she did not tell Mr. Tyse that she hurt her leg, she finally admitted that she told Mr. Tyse that she was *worried* about her leg. And when confronted with her deposition testimony, not only did she admit to having told Mr. Tyse of her concern for her leg, but she also recalled that as being one of the first things that she had told him. Plaintiff's ability to provide such detail indicates that she was acutely aware of the falsity of her initial statement. This similarity (injured leg as compared to concerned about leg) along with Plaintiff's blatant deceit, is enough for the Court to find that she did convey to Mr. Tyse what he included in his report; facts that happen to be completely at odds with what she now asserts.

Nor is the Court convinced that there was indeed a broken chair ring. Initially, the Court notes that, after observing her testimonial demeanor and reviewing the many inconsistencies within her own testimony and with other evidence, the Court finds

63

Plaintiff's testimony to be largely incredible. Plaintiff offered the testimony of both her sister and brother-in-law to bolster her contention that the ring was broken. However, the testimony provided by the three was also inconsistent. Plaintiff testified that, before she walked to another machine and began playing, Robert looked at the alleged defective chair and said, "'That's where – what you fell on is the [left ring] was broke. It's broke.'" At that point, she, too, noticed that the left front piece was hanging. Conversely, Robert testified that it was Plaintiff, not he, that initially noticed the broken ring. After Plaintiff brought the ring to his attention, he looked and saw that the right rear portion of the ring was indeed broken. Similarly, Theresa testified that Plaintiff first brought the defective stool ring to their attention; as Theresa stood facing the chair, she then noticed that the right portion of the ring was hanging down. Initially, the Court notes the inconsistencies contained in the testimony of the three individuals; specifically, with regard to who first observed the alleged broken ring. While Plaintiff maintained that it was Robert who pointed the broken ring out to her, Theresa and Robert both testified that it was instead Plaintiff herself who originally noticed the ring.

The Court considers these and other contradictions, in combination with the parties' obvious bias and motives to

fabricate testimony, and fails to find them entirely credible. Indeed, both Robert and Theresa falsely testified to at least one fact that would greatly support Plaintiff's claims against Defendant; namely, that immediately after the incident, Plaintiff identified the ring as the cause of her fall. However, as discussed earlier, Plaintiff testified that directly after the fall she expressed that she did not know what happened.

Further, though all three individuals claimed to have looked at the ring, they provided varying descriptions. Plaintiff testified that the legs were made of metal - a fact corroborated by Mr. Tyse; Mr. Tyse further testified that the ring was also composed of metal. Robert, on the other hand, incorrectly testified that the legs and ring of the chair were made of wood, though he subsequently changed his testimony and indicated that the "ring could have been metal," but he did not know. The Court finds it implausible that all three looked at the chair and determined that it was broken, yet failed to take note of a most basic fact - the composition of the chair's legs and/or ring. And though all three claimed to have perused the carpet in the area for screws, metal, or other debris - evidence, presumably, that the ring had indeed separated from the legs of the chair - neither Plaintiff nor Robert knew the manner in which the ring was attached to the chair's legs - a helpful fact to discern *prior* to inspection. And what's even more remarkable is that the

65

witnesses were unable to consistently testify as to which side of the ring was broken; while Bill and Theresa indicated the right portion, Plaintiff stated that it was the left.

While the Court factored all of the aforementioned testimony into its finding, it was ultimately persuaded by the incident report and testimony of Mr. Tyse. The Court finds Mr. Tyse - based upon his testimonial demeanor, lack of motive, experience handling such matters, and corroborated incident report - to be a credible witness. And both his testimony and report indicate that no defective chairs were found in the area of the incident. Plaintiff disputes Mr. Tyse's assertion that, after speaking with her, he checked the chair in question. Instead, she asserts that after taking her statement, Mr. Tyse walked out the door and down the stairs that allow passengers to exit the river boat. However, Plaintiff testified that, during the short period of time that she remained on the vessel after making the report, she was "just trying to find everybody." It is, therefore, entirely possible that Mr. Tyse examined the chair during which time Plaintiff was looking for the other members of her party.

And though Plaintiff would likely argue that, at the time of the report's completion, Mr. Tyse was an employee of Defendant and thus had motive to fabricate his report, the Court notes that, in an effort to prevent additional falls, and thus, shield Defendant from further potential liability, had Mr. Tyse been

66

aware of a broken chair, he would also have had motive to remove the chair from the casino floor. In spite of this, Plaintiff testified that Mr. Tyse did not even look at the chair, let alone remove it, following the incident. The Court finds it to be even more curious, that Ms. Aiken, having witnessed the fall, failed to take any measures to remove the chair from the casino floor, though she allegedly witnessed its defective condition. Consequently, the Court finds that, consistent with his report and testimony, Mr. Tyse inspected the chairs in the vicinity of the accident and found them to be secure.[15] The Court, therefore, finds that the ring of the chair was not broken.

And even assuming, *arguendo*, that Plaintiff had proved that she was injured by a defective chair ring, the Court finds that she has now shown, by a preponderance of the evidence, that her injuries resulted from the fall. Indeed, Plaintiff experienced the same symptoms alleged to be indicative of a cervical disc herniation years prior to the fall at Harrah's. Dr. Tong testified that he could not say that the disc herniation at C5-6 was not present prior to Plaintiff's fall at Harrah's; he stated that he could not say that the left-sided symptoms that Plaintiff

---

[15]  The Court also notes that neither Robert nor Theresa reported the defective chair to a Harrah's employee. Nor were they made aware that Plaintiff had allegedly reported it until they had left the casino. While the Court does not mean to imply that they were required to do so, it does seem as though they would want the chair removed from the casino floor so as to prevent further injury to other patrons.

67

suffered from resulted from the fall. And while Dr. Tong subsequently opined that the previous symptoms were unrelated to her herniated disc, Dr. Iftikhar, a neurosurgeon, testified that, as a result of the presence of these symptoms prior to the incident, it was "difficult" for him to say, with any reasonable degree of medical certainty, that Plaintiff's fall at Harrah's caused her herniated disc. To be sure, he stated that Plaintiff's complaints from October 1999 were entirely consistent with a disc herniation.

Further, Plaintiff, herself, indicated that her neck pain was not constant, that she only had it "once in a great, great while." While this could explain why she visited Dr. Tong, a doctor whom she went to for "everything," on at least ten occasions without once complaining of neck pain,[16] it could also be an indication that the symptoms that Plaintiff experienced following the fall were a continuation of symptoms that she had reported earlier or symptoms that, as Dr. Nockells and other physicians opined, resulted from degenerative changes. It is of consequence that Dr. Nockells indicated that the C5-C6 disc is the first to degenerate. As such, the Court believes that it

---

[16] The dates of the visits are as follows: February 24, 2002; May 13, 2002; July 9, 2002; October 21, 2002; February 10, 2003; February 18, 2003; March 10, 2003; July 9, 2003; July 16, 2003; July 31, 2003; and November 28, 2003. With the exception of the records from July 19, 2002, there is no mention of neck pain. On that date however, the records specifically indicate that Plaintiff was not experiencing neck pain. (J. Ex. 4 at 8.)

68

would be unjust to hold Defendant liable for injuries that potentially existed prior to Plaintiff's fall at Harrah's or even injuries that occurred naturally as her body aged.

The Court is further concerned because nothing detrimental to Plaintiff's case seemed to "stick out in [her] mind." To be sure, Plaintiff was unable to recall that she had visited Dr. Tong prior to the incident complaining of neck pain. Nor did she recall previously telling Dr. Tong about - or even experiencing - pain radiating down into her right arm, as well as tingling and numbness when she used her right arm. Similarly, Plaintiff was unable to recollect having made prior complaints to Dr. Tong regarding left arm pain and left shoulder pain that radiated into her neck. These are all facts that, at the very least, have the potential to be very damaging to her claim that her fall at Harrah's was the cause of her ailments. And these are all facts that are - despite Plaintiff's lack of recollection - supported by objective, credible, medical documentation. Moreover, though having screamed "like a crazy person" upon receiving a steroid injection in her right shoulder, Plaintiff incorrectly testified that she had instead received it in her left. She eventually acknowledged that she really didn't know on which side she had received the injection - a most important and remarkable detail considering how distressing the event was for her - but, amazingly enough, she was able to provide a detailed account of a

69

routine examination performed by Dr. Iftikhar in 2001. It is not surprising that accurate testimony regarding the steroid injection could possibly have damaged her case, while her comprehensive testimony regarding her visit to Dr. Iftikhar had the potential to bolster it.

## Conclusion

For the reasons set forth above, the Court finds that Plaintiff has not shown, by a preponderance of the evidence, that Defendant was negligent. Therefore, judgment is entered in favor of Defendant and against Plaintiff.

Dated: April 15, 2009

E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT